1

2

3

4

5

6

7

8            IN THE UNITED STATES DISTRICT COURT

9          FOR THE EASTERN DISTRICT OF CALIFORNIA

10   MICHAEL HANSEN,

11            Petitioner,              No. CIV S-09-2646 GEB DAD P

12       vs.

13   M. MARTEL,

14            Respondent.          FINDINGS & RECOMMENDATIONS

15   _____/

16          Petitioner is a state prisoner proceeding pro se with a petition for a writ of habeas

17   corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges the decision of the California Board

18   of Parole Hearings (hereinafter "Board") to deny him parole for one year at his third subsequent

19   parole consideration hearing held on July 9, 2008.  Petitioner claims that the Board's decision

20   violated both state law and his federal constitutional right to due process.  Upon careful

21   consideration of the record and the applicable law, the undersigned will recommend that

22   petitioner's application for habeas corpus relief be granted.

23                      PROCEDURAL BACKGROUND

24          Petitioner is confined pursuant to a judgment of conviction entered in the San

25   Diego County Superior Court in 1992.  (Pet. (Doc. No. 1) at 35.)  At that time petitioner was

26   found guilty of second degree murder, in violation of California Penal Code § 187(a), and of

1

1   shooting into an inhabited dwelling, in violation of California Penal Code § 246. (Id.) On

2   August 10, 1992, petitioner was sentenced to state prison for a term of fifteen years to life with

3   the possibility of parole. (Id.) Petitioner's third subsequent parole consideration hearing, which

4   is placed at issue by the instant habeas petition, was held on July 9, 2008. (Id. at 39.)[1] On that

5   date, a panel of the Board of Parole Hearings (hereinafter "Board") found petitioner not suitable

6   for release and denied parole for one year. (Id. at 101.)

7         Thereafter, petitioner filed a petition for a writ of habeas corpus in the San Diego

8   County Superior Court, claiming that the Board's failure to find him suitable for parole at his

9   third subsequent suitability hearing violated his federal constitutional rights. (Answer, Ex. 1,

10  Part 1 (Doc. No. 10-1.)) On March, 19, 2009, the Superior Court rejected petitioner's claims in a

11  reasoned decision on the merits. (Answer, Ex. 2 (Doc. No. 10-3.))

12        Petitioner thereafter filed a habeas petition in the California Court of Appeal for

13  the First Appellate District. (Answer, Ex. 3, Part 1 (Doc. No. 10-4.)) The California Court of

14  Appeal summarily denied that petition on June 3, 2009. (Answer, Ex. 4 (Doc. No. 10-6.))

15  Petitioner next filed a habeas petition in the California Supreme Court. (Answer, Ex. 5 (Doc.

16  No. 10-6.)) That petition was summarily denied on August 26, 2009. (Answer, Ex. 6 (Doc. No.

17  10-6.))

18        On September 22, 2009, petitioner filed the federal habeas petition now before

19  this court. (Doc. No. 1.) Respondent filed an answer on January 7, 2010. (Doc. No. 10.)

20  Petitioner filed a traverse on January 19, 2010. (Doc. No. 13.)

21                      FACTUAL BACKGROUND

22        At the outset of the July 9, 2008 hearing the Board incorporated by reference the

23  facts of petitioner's commitment offense as set forth in the November 2, 1993 decision of the

24  California Court of Appeals affirming his judgment of conviction (Pet. (Doc. No. 1) at 44),

25  ————————————

26       [1] Page number citations such as this one are to the page number reflected on the court's CM/ECF system and not to page numbers assigned by the parties.

2

which recites the facts of petitioner's commitment offense as follows:

A. *Prosecution Case*

On the afternoon of September 19, 1991, Rudolfo Andrade, Alexander Maycott and appellant wished to purchase $40 worth of methamphetamine. To that end, appellant, his girlfriend Kimberly Geldon and Maycott drove in appellant's orange Camaro to an apartment at 5675 Albemarle in the City of San Diego.

On arriving, appellant attempted to contact Christina Almenar in her upstairs apartment. Unable to do so, appellant started to walk back to his car when he was stopped by Michael Echaves who lived in the apartment below Christina's with Martha Almenar and her two children, 13-year-old Diane and 5-year-old Louie. As appellant walked to and from Christina's apartment, Michael, Diane and Louie were cleaning the yard.

Echaves asked appellant who he was looking for. Appellant asked Echaves if he had seen Christina. When he said he had not, appellant asked Echaves if he could get some methamphetamine. After making a telephone call, Echaves told appellant he could. Appellant stated he would attempt to buy the drug elsewhere but if unsuccessful he would return. Appellant and his friends departed but returned about 20 minutes later. Appellant asked Echaves if he could still get the methamphetamine. He stated he could, got into appellant's car and drove with appellant, Maycott and Geldon to another location.

Appellant gave Echaves two $20 bills and told Echaves he would wait while Echaves got the methamphetamine. Echaves got out of the car and walked away.

When Echaves did not return, appellant and his friends went back to Echaves's apartment on Albemarle. Appellant went to the door and knocked. Diane and Louie were home alone and did not answer the door.

After waiting for a time, appellant, Maycott and Geldon decided to return to where Andrade, who had put up part of the money for the drug purchase, was waiting. On the way they stopped at the home of Danny Gomez and acquired a handgun.

The three returned to where Andrade was waiting. Geldon got out of the car and Andrade got in. The men decided they would return to the apartment on Albemarle to find Echaves and to either get their money or beat him up. At about 7:30 p.m., appellant drove his car down Albemarle with the lights out, maneuvered nearer the house and fired the gun repeatedly at the dwelling. Diane was struck in the head by one of the shots and later died from her wound.

Based on information from witnesses, the police were able to trace the car from which the shots were fired to appellant.  At approximately 3 a.m. on September 20, officers contacted appellant at his motel in San Ysidro.  A search of the car's trunk revealed a 9mm semi-automatic pistol and an empty ammunition clip for the weapon.  No fingerprints were found on the gun but tests indicated shell casings found at the scene were ejected from the gun and bullets collected at the apartment were fired by the weapon.

Appellant agreed to talk with the officers and admitted firing the gun at the apartment.  Appellant refused to give the names of the other persons who were with him.

Appellant later gave an officer the names of the other two persons in the car.  Appellant also told the officer he and the other two men in the car wanted to do the shooting but appellant fired the gun because he was in the best position.

B. *Defense Case*

Appellant testified in his own defense and stated that on the day of the shooting he consumed a considerable quantity of alcohol and did a "line" of methamphetamine.  Appellant testified he had been involved in motorcycle accidents in the past in which he had been seriously injured and had lost consciousness.  Appellant stated when he first drove back to the apartment on Albemarle, he saw a light on and believed Echaves was inside.  After knocking, however, and getting no response, appellant concluded Echaves was not at home.

Appellant testified Maycott had the gun as the men returned to the apartment.  Appellant took the gun from him when he pointed it at a boy on the street.  Appellant denied any recollection of firing the gun but did remember hearing shots.  Appellant stated he had doubts he fired the gun. Appellant stated that much of what he told the officers after the shooting was untrue and that he told them he fired the gun because he felt responsible and because he did not wish to be a "snitch."  Appellant stated he had no intention to kill anyone.  Appellant denied making any subsequent statements to the police concerning the shooting.  Appellant specifically denied telling officers all three of the men wanted to do the shooting but appellant fired the gun since he was in the best position to do so.

A neurologist and a psychologist testified appellant suffered from a mild prefrontal lobe injury, that, especially in conjunction with the use of alcohol, could result in sudden, unplanned and impulsive actions.

A toxicologist testified that based on appellant's report of the amount of alcohol he had consumed the evening of the shooting

4

1   and given the reported time of that ingestion, appellant would have
    had a 0.20 to 0.30 blood alcohol level at the time of the shooting.
2   The expert testified an "alcohol blackout" occurs when after the
    use of alcohol the individual is conscious and goes about normal
3   activities but is later unable to remember what happened during
    that period of time.
4

5   (Answer, Ex. 1, Part 2 (Doc. No. 10-2) at 61-63).

6          The Board then questioned petitioner regarding the commitment offense as

7   follows:

8          PRESIDING COMMISSIONER BRYSON: Tell us what led up to
           this crime.
9
           INMATE HANSEN: On that particular night?
10
           PRESIDING COMMISSIONER BRYSON: Yes.
11
           INMATE HANSEN: I had just gotten off of work and gotten paid
12         and was drinking some alcohol with some friends.  Went to a
           buddy's house of mine and the guy there wanted to purchase some
13         methamphetamine.  And I had told (sic) that I knew of a couple
           places where I could receive it.  And so, we went looking for it.
14         The place that I'd thought I could receive it - - get it, she didn't
           have none.  So I went back, went to another place where I thought I
15         could receive some, and she wasn't home.  And as I was leaving,
           there was this guy that was in the - - in the front house - - front of
16         the house who told me - - asked me who I was looking for.  And I
           told him that I was looking for Christina.  And he told me that she
17         wasn't home and that he can - - asked me what I was looking for.
           So I told him I was looking to buy some methamphetamine.  And
18         so he went and made a - - - made a phone call and told me that his
           connection wasn't home.  And so I left, went back to the other
19         place; the first place I went to and see if she'd gotten any
           methamphetamine yet.
20
           PRESIDING COMMISSIONER BRYSON: Now the first place
21         you went to was to?

22         INMATE HANSEN: Barbara Gomez.

23         PRESIDING COMMISSIONER BRYSON: Okay.

24         INMATE HANSEN: And she hadn't received any yet, so I went
           back to Mike Eschevez' (sp) place, picked him up and went to - -
25         went to where he thought he could get us some methamphetamine.
           And he took the money and went in and never returned.  So, we
26         went back to the place where we had dropped him off, and went in

                                          5

1 - - went around looking to see if we could find where he was at, and we couldn't.  So we went back to where we picked him up

2 from on Abermal (sp) Street, and knocked on the doors, went around the house looking, and nobody would answer.  So, went

3 and picked up - - went and picked up a gun and - -

4 PRESIDING COMMISSIONER BRYSON: Who went and picked up the gun?

5

6 INMATE HANSEN: Me, Alex and Kimberly.  And we - - then we went from - - After we picked up the gun, we went back to where Rudy was at, dropped off Androtti (sp) or dropped off Galvan,

7 Kimberly and picked up Rudy Androtti and went back down to the complex.  And when we went down there, it's Alex Maycock (sic)

8 pulled the gun out from behind the back of the seat and pointed it at this guy on - - this boy on the street, who was Jeff Landry.  You

9 know, in doing so, I took the gun from him and shot into the house on the way by.

10

11 PRESIDING COMMISSIONER BRYSON: Why did you do that?

12 INMATE HANSEN: There's no rational reason for why I did what I did, other than poor choices and decisions.  I mean it was - - it

13 was either I was thinking that it was, you know, either we weren't going to get our money back or it was going to be the equivalent of the money that we'd lost or - -

14

15 PRESIDING COMMISSIONER BRYSON: What was going to be the equivalent for the money he had - -

16 INMATE HANSEN: The damage to the house.  And, also, we were - - the - - and - - we were intending on using the gun as a tool

17 of intimidation.  And not being fearful - - being scared of not knowing what could have possibly happened if we would have

18 confronted him, I thought that shooting into the house would end it and it would be over with.

19

20 PRESIDING COMMISSIONER BRYSON: I'm not - - It's very difficult to follow that sort of reasoning.

21 INMATE HANSEN: Logic?

22 PRESIDING COMMISSIONER BRYSON: Yeah, that logic.

23 INMATE HANSEN: I know.  That's why - - That's why - - That's what I'm saying.  There is no clear understanding or rational reason

24 for what I did other - - I mean I can't blame it on the alcohol, because if was my poor decision that ended it, and the result of the

25 death of Diane Rosales.

26 /////

6

1  PRESIDING COMMISSIONER BRYSON: You emptied the entire clip into the - - that residence.  Correct?

2

3  INMATE HANSEN: From my understanding, the entire clip was emptied, but only three bullets entered the house.

4  PRESIDING COMMISSIONER BRYSON: How many times did you shoot?

5

6  INMATE HANSEN: I believe it was nine, ten.

7  PRESIDING COMMISSIONER BRYSON: Meaning that you pointed the gun and emptied the clip.  Correct?

8  INMATE HANSEN: Correct.

9  PRESIDING COMMISSIONER BRYSON: And the way the record reads, it appears that you would have known or should have

10  known that, in fact, 13-year old Diane and 5-year old Louie lived up there in that apartment.  Is that not correct?

11

12  INMATE HANSEN: I did not.  I mean I knew that they had lived there, but like I said earlier, when I knocked on the door and went around the house to see if I could see if anybody was home, there

13  appeared to be nobody at home.  I mean if I would have known that there was anybody in the house, I definitely wouldn't have - - I'm

14  hope - - definitely wouldn't have made the decision that I made to shoot into the house.

15

16  PRESIDING COMMISSIONER BRYSON: Now you said just a moment ago that Alex pointed at Jeff Landry.

17  INMATE HANSEN: Correct.

18  PRESIDING COMMISSIONER BRYSON: The gun.  So, Alex was one of the - - That was one of your co-partners here.  Is that

19  right?

20  INMATE HANSEN: Correct.

21  PRESIDING COMMISSIONER BRYSON: And why did he point the gun at Jeff Landry?

22

23  INMATE HANSEN: I have no idea.  I didn't bother to ask him.

24  PRESIDING COMMISSIONER BRYSON: So, you did - - you have no idea?

25  INMATE HANSEN: No.

26  /////

PRESIDING COMMISSIONER BRYSON: So you didn't know Jeff Landry?

INMATE HANSEN: No, Sir - - I mean no, Ma'am.

PRESIDING COMMISSIONER BRYSON: That's all right.  But if you didn't have any idea why he was pointing the gun, why did you grab it from him and then shoot into the house.

INMATE HANSEN: The only conclusion that I can come up with is that I was - - I was - - after he pointed it at Jeff Landry, I was - - I was fearful of what could possibly happen if we did encounter Mike Eschevez.  So to avoid that situation  - -

PRESIDING COMMISSIONER BRYSON: But you had a gun.

INMATE HANSEN: I know.

PRESIDING COMMISSIONER BRYSON: So - -

INMATE HANSEN: It was just going to - - It was going to be a tool of intimidation, so not nothing - - not intending on shooting anybody.

PRESIDING COMMISSIONER BRYSON: So you're claiming still, these many years later that you didn't intend to shoot anyone?

INMATE HANSEN: I didn't intend to kill anyone or shoot anybody.  Yes.

PRESIDING COMMISSIONER BRYSON: And what did you do after you shot the weapon?

INMATE HANSEN: We went to - - Rudy directed me to some warehouse place where his mom had worked, and we dropped off the gun and some pallet - - wood pallets and went - -

PRESIDING COMMISSIONER BRYSON: Dropped off the gun and some what?

INMATE HANSEN: We had hid it.

PRESIDING COMMISSIONER BRYSON: Wouldn't that be like hiding the gun?

INMATE HANSEN: Yeah, we hid the gun in some - - in some wood pallets at his - - behind his mom's work and went to Chicano Park and purchased some methamphetamine from Rudy's friends.

PRESIDING COMMISSIONER BRYSON: And how did you learn that you had killed someone?

8

INMATE HANSEN: On the way back from Chicano Park, we stopped, picked up the weapon, because Rudy had thought that the trash was going to be picked up and he didn't want the gun to be found behind his mom's work.  And from there, we went to - - I went - - We drove back into Paradise Hills and I had picked up - - dropped off Rudy and Alex and picked up Kimberly.  And on the way back to my hotel, she told me that they came looking for us because they didn't - - we didn't come back in time.  And she said that she'd seen the cops and everybody down there, and said somebody had been shot.  And I didn't - - I didn't want to believe it, but then when I got back to the hotel and turned on the T.V., the news, it was on the news that somebody had been shot and killed.

PRESIDING COMMISSIONER BRYSON: So what did you do?

INMATE HANSEN: At that point, I did not want to believe it, but I had - - I was torn between what to do.  I mean I had never been in a situation like that, so I wasn't sure what to do.  And I'd thought about turning myself in and I had ended up passing out.  And the police arrived at 3:30 - - 3:00 in the morning and arrested me.  So I know I had - - I know I had ample opportunity to turn myself in, but I had - - I had passed out, so I wasn't - - I wasn't able to.  But I'm sure I would have once I had awoken.

(Pet. (Doc. No. 1) at 45-52.)

## ANALYSIS

I. Standards of Review Applicable to Habeas Corpus Claims

A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of some transgression of federal law binding on the state courts.  See Peltier v. Wright, 15 F.3d 860, 861 (9th Cir. 1993); Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)).  A federal writ is not available for alleged error in the interpretation or application of state law.  See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000); Middleton, 768 F.2d at 1085.  Habeas corpus cannot be utilized to try state issues de novo.  Milton v. Wainwright, 407 U.S. 371, 377 (1972).

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Clark v. Murphy, 331 F.3d 1062, 1067 (9th Cir. 2003).  Section 2254(d) sets forth the following standards for granting

1  habeas corpus relief:

2         An application for a writ of habeas corpus on behalf of a
    person in custody pursuant to the judgment of a State court shall
3   not be granted with respect to any claim that was adjudicated on
    the merits in State court proceedings unless the adjudication of the
4   claim -

5         (1) resulted in a decision that was contrary to, or involved
    an unreasonable application of, clearly established Federal law, as
6   determined by the Supreme Court of the United States; or

7         (2) resulted in a decision that was based on an unreasonable
    determination of the facts in light of the evidence presented in the
8   State court proceeding.

9  See also Penry v. Johnson, 532 U.S. 782, 792-93 (2001); Williams v. Taylor, 529 U.S. 362

10 (2000); Lockhart v. Terhune, 250 F.3d 1223, 1229 (9th Cir. 2001).  If the state court's decision

11 does not meet the criteria set forth in § 2254(d), a reviewing court must conduct a de novo review

12 of a habeas petitioner's claims.  Delgadillo v. Woodford, 527 F.3d 919, 925 (9th Cir. 2008).  See

13 also Frantz v. Hazey, 513 F.3d 1002, 1013 (9th Cir. 2008) (en banc) ("[I]t is now clear both that

14 we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such

15 error, we must decide the habeas petition by considering de novo the constitutional issues

16 raised.").

17         The court looks to the last reasoned state court decision as the basis for the state

18 court judgment.  Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).  If the last reasoned

19 state court decision adopts or substantially incorporates the reasoning from a previous state court

20 decision, this court may consider both decisions to ascertain the reasoning of the last decision.

21 Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc).

22 II.  Petitioner's Claim

23     A.  Due Process

24         Petitioner claims that the Board's decision finding him unsuitable for parole

25 violated his right to due process.  He argues that there was no evidence before the Board

26 indicating that he posed "any risk of danger to public safety whatsoever."  (Pet. at 4, 18-22.)

1   Petitioner also argues that the Board's decision finding him unsuitable for parole "failed to

2   suggest a nexus between the immutable 17-year old offense" and any "current risk to public

3   safety." (Id. at 4, 23-26.)  Petitioner further claims that his 2007 psychological evaluation was

4   "favorable" and did not provide "a valid basis for denying parole." (Id. at 5, 27-28.)

5           1.  Applicable Legal Standards

6               a.  Due Process in the California Parole Context

7           The Due Process Clause of the Fourteenth Amendment prohibits state action that

8   deprives a person of life, liberty, or property without due process of law.  A litigant alleging a

9   due process violation must first demonstrate that he was deprived of a liberty or property interest

10  protected by the Due Process Clause and then show that the procedures attendant upon the

11  deprivation were not constitutionally sufficient.  Kentucky Dep't of Corrections v. Thompson,

12  490 U.S. 454, 459-60 (1989); McQuillion v. Duncan, 306 F.3d 895, 900 (9th Cir. 2002).[2]

13          A protected liberty interest may arise from either the Due Process Clause of the

14  United States Constitution "by reason of guarantees implicit in the word 'liberty,'" or from "an

15  expectation or interest created by state laws or policies."  Wilkinson v. Austin,  545 U.S. 209,

16  221 (2005) (citations omitted).  See also Board of Pardons v. Allen, 482 U.S. 369, 373 (1987).

17  The United States Constitution does not, of its own force, create a protected liberty interest in a

18  parole date, even one that has been set.  Jago v. Van Curen, 454 U.S. 14, 17-21 (1981);

19  Greenholtz v. Inmates of Neb. Penal, 442 U.S. 1, 7 (1979) (There is "no constitutional or

20  inherent right of a convicted person to be conditionally released before the expiration of a valid

21

22          [2]  In the context of parole proceedings, the "full panoply of rights" afforded to criminal
23  defendants is not "constitutionally mandated" under the federal Due Process Clause. Jancsek v.
    Oregon Bd. of Parole, 833 F.2d 1389, 1390 (9th Cir. 1987) (internal quotations and citation
24  omitted).  The United States Supreme Court has held that due process is satisfied in the context
    of a hearing to set a parole date where a prisoner is afforded notice of the hearing, an opportunity
25  to be heard and, if parole is denied, a statement of the reasons for the denial.  Hayward v.
    Marshall, 603 F.3d 546, 560 (9th Cir. 2010) (en banc) (quoting Greenholtz, 442 U.S. at 16).  See
26  also Morrissey v. Brewer, 408 U.S. 471, 481 (1972) (describing the procedural process due in
    cases involving parole issues).

1   sentence."); <u>see also</u> <u>Hayward v. Marshall</u>, 603 F.3d 546, 561 (9th Cir. 2010) ("[I]n the absence

2   of state law establishing otherwise, there is no federal constitutional requirement that parole be

3   granted in the absence of 'some evidence' of future dangerousness or anything else.") (en banc).

4   However, "a state's statutory scheme, if it uses mandatory language, 'creates a presumption that

5   parole release will be granted' when or unless certain designated findings are made, and thereby

6   gives rise to a constitutional liberty interest." <u>McQuillion</u>, 306 F.3d at 901 (quoting <u>Greenholtz</u>,

7   442 U.S. at 12). <u>See also</u> <u>Allen</u>, 482 U.S. at 376-78; <u>Pearson v. Muntz</u>, 606 F.3d 606, 609 (9th

8   Cir. 2010) ("The principle that state law gives rise to liberty interests that may be enforced as a

9   matter of federal law is long established."); <u>Hayward</u>, 603 F.3d 562-63 ("Although the Due

10   Process Clause does not, by itself, entitle a prisoner to parole in the absence of some evidence of

11   future dangerousness, state law may supply a predicate for that conclusion.")

12          In California, a prisoner is entitled to release on parole unless there is "some

13   evidence" of his or her current dangerousness. <u>Hayward</u>, 603 F.3d at 562 (citing <u>In re Lawrence</u>,

14   44 Cal.4th 1181, 1205-06, 1210 (2008) and <u>In re Shaputis</u>, 44 Cal. 4th 1241 (2008)); <u>Cooke v.</u>

15   <u>Solis</u>, 606 F.3d 1206, 1213 (9th Cir. 2010), <u>pet.</u> <u>for</u> <u>cert.</u> <u>filed</u> 79 USLW 3141 (Sept. 2, 2010)

16   (No. 10-333); <u>Pirtle v. California Bd. of Prison Terms</u>, 611 F.3d 1015, 1020 (9th Cir. 2010); <u>In re</u>

17   <u>Rosenkrantz</u>, 29 Cal.4th 616, 651-53 (2002). Therefore, "California's parole scheme gives rise

18   to a cognizable liberty interest in release on parole." <u>Pirtle</u>, 611 F.3d at 1020 (quoting

19   <u>McQuillion</u>, 306 F.3d at 902). This liberty interest is enforceable under the federal Due Process

20   Clause pursuant to clearly established federal law. <u>Haggard v. Curry</u>, 623 F.3d 1035, 1040-41

21   (9th Cir. 2010); <u>Cooke</u>, 606 F.3d at 1213 (denial of parole to a California prisoner "in the

22   absence of 'some evidence' of current dangerousness . . . violat[es] . . . his federal right to due

23   process."); <u>Pearson</u>, 606 F.3d at 609 (a state parole system that gives rise to a liberty interest in

24   parole release is enforceable under the federal Due Process Clause); <u>Hayward</u>, 603 F.3d at 563;

25   <u>see also</u> <u>Castelan v. Campbell</u>, No. 2:06-cv-01906-MMM, 2010 WL 3834838, at * 2 (E.D. Cal.

26   Sept. 30, 2010) (McKeown, J.) ("In other words, in requiring [federal] habeas courts to review

1   parole denials for compliance with California's 'some evidence' rule, <u>Hayward</u> holds that

2   California state constitutional law creates a cognizable interest in parole absent 'some evidence'

3   of dangerousness, and that the federal Due Process Clause in turn incorporates that right as a

4   matter of clearly established federal law.")

5                    b.  <u>California's Statutes and Regulations on Parole</u>

6            When a federal court assesses whether a state parole board's suitability

7   determination was supported by "some evidence" in a habeas case, that analysis "is shaped by the

8   state regulatory, statutory, and constitutional law that governs parole suitability determinations in

9   California."  <u>Pirtle</u>, 611 F.3d at 1020 (citing <u>Hayward</u>, 603 F.3d at 561-62).  The setting of a

10  parole date for a California state prisoner is conditioned on a finding of suitability.  Cal. Penal

11  Code § 3041; Cal. Code Regs. tit. 15, §§ 2401 & 2402.  The state regulation that governs parole

12  suitability findings for life prisoners states as follows with regard to the statutory requirement of

13  California Penal Code § 3041(b):  "Regardless of the length of time served, a life prisoner shall

14  be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose

15  an unreasonable risk of danger to society if released from prison."  Cal. Code Regs. tit. 15, §

16  2281(a).  In California, the overriding concern in determining parole suitability is public safety.

17  <u>In re Dannenberg</u>, 34 Cal. 4th 1061, 1086 (2005).  This "core determination of 'public safety' . . .

18  involves an assessment of an inmates *current* dangerousness."  <u>In re Lawrence</u>, 44 Cal. 4th at

19  1205 (emphasis in original).  Accordingly,

20            when a court reviews a decision of the Board or the Governor, the
             relevant inquiry is whether some evidence supports the decision of
21            the Board or the Governor that the inmate constitutes a current
             threat to public safety, and not merely whether some evidence
22            confirms the existence of certain factual findings.

23  <u>Id</u>. at 1212 (citing <u>In re Rosenkrantz</u>, 29 Cal. 4th at 658; <u>In re Dannenberg</u>, 34 Cal. 4th at 1071;

24  and <u>In re Lee</u>, 143 Cal. App.4th 1400, 1408 (2006)).  "In short, 'some evidence' of future

25  dangerousness is indeed a state *sine qua non* for denial of parole in California."  <u>Pirtle</u>, 611 F.3d

26  /////

at 1021 (quoting <u>Hayward</u>, 603 F.3d at 562).  <u>See also</u> <u>Cooke</u>, 606 F.3d at 1214.[3]

Under California law, prisoners serving indeterminate prison sentences "may serve up to life in prison, but they become eligible for parole consideration after serving minimum terms of confinement."  <u>In re Dannenberg</u>, 34 Cal. 4th at 1078.  The Board normally sets a parole release date one year prior to the inmate's minimum eligible parole release date, and does so "in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public."  <u>In re Lawrence</u>, 44 Cal. 4th at 1202 (citing Cal. Penal Code § 3041(a)).  A release date must be set "unless [the Board] determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration . . . and that a parole date, therefore, cannot be fixed . . . ."  Cal. Penal Code § 3041(b).  In determining whether an inmate is suitable for parole, the Board must consider all relevant, reliable information available regarding

> the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release.

Cal. Code Regs., tit. 15, § 2281(b).  However, "there must be more than the crime or its

---

[3] As the Ninth Circuit has explained, the "some evidence"

> requirement imposes substantive rather than purely procedural constraints on state officials' discretion to grant or deny parole: "a reviewing court . . . is not bound to affirm a parole decision merely because the Board or the Governor has adhered to all procedural safeguards."  <u>In re Lawrence</u>, 44 Cal.4th [at 1210].  Rather the court must ensure that the decision to deny parole is "supported by some evidence, not merely by a hunch or intuition."  <u>Id.</u> [at 1212].

<u>Cooke</u>, 606 F.3d at 1213-14.

1    circumstances alone to justify the Board's or the Governor's finding of current dangerousness."

2    Cooke, 606 F.3d at 1214.  See also Lawrence, 44 Cal. 4th at 1211 ("But the statutory and

3    regulatory mandate to normally grant parole to life prisoners who have committed murder means

4    that, particularly after these prisoners have served their suggested base terms, the underlying

5    circumstances of the commitment offense alone rarely will provide a valid basis for denying

6    parole when there is strong evidence of rehabilitation and no other evidence of current

7    dangerousness."); McCullough v. Kane, ___F.3d___, 2010 WL 5263140, at *6 (9th Cir. Dec. 27,

8    2010) (affirming a grant of habeas relief upon finding that due process was violated by "reliance

9    upon the immutable and unchanging circumstances of [the] commitment offense[.]")

10          The regulation identifies circumstances that tend to show suitability or

11   unsuitability for release.  Cal. Code Regs., tit. 15, § 2281(c) & (d).  The following circumstances

12   are identified as tending to show that a prisoner is suitable for release:  the prisoner has no

13   juvenile record of assaulting others or committing crimes with a potential of personal harm to

14   victims; the prisoner has experienced reasonably stable relationships with others; the prisoner has

15   performed acts that tend to indicate the presence of remorse or has given indications that he

16   understands the nature and magnitude of his offense; the prisoner committed his crime as the

17   result of significant stress in his life; the prisoner's criminal behavior resulted from having been

18   victimized by battered women syndrome; the prisoner lacks a significant history of violent crime;

19   the prisoner's present age reduces the probability of recidivism; the prisoner has made realistic

20   plans for release or has developed marketable skills that can be put to use upon release;

21   institutional activities indicate an enhanced ability to function within the law upon release.  Id., §

22   2281(d).

23          The following circumstances are identified as tending to indicate unsuitability for

24   release:  the prisoner committed the offense in an especially heinous, atrocious, or cruel manner;

25   the prisoner had a previous record of violence; the prisoner has an unstable social history; the

26   prisoner's crime was a sadistic sexual offense; the prisoner had a lengthy history of severe mental

problems related to the offense; the prisoner has engaged in serious misconduct in prison.  Id., §

2281(c).  Factors to consider in deciding whether the prisoner's offense was committed in an

especially heinous, atrocious, or cruel manner include:  multiple victims were attacked, injured,

or killed in the same or separate incidents; the offense was carried out in a dispassionate and

calculated manner, such as an execution-style murder; the victim was abused, defiled or

mutilated during or after the offense; the offense was carried out in a manner that demonstrated

an exceptionally callous disregard for human suffering; the motive for the crime is inexplicable

or very trivial in relation to the offense.  Id., § 2281(c)(1)(A) - (E).

> In the end, under state law as clarified by the California Supreme Court,

> the determination whether an inmate poses a current danger is not
> dependent upon whether his or her commitment offense is more or
> less egregious than other, similar crimes.  (*Dannenberg, supra*, 34
> Cal. 4th at pp 1083-84 [parallel citations omitted].)  Nor is it
> dependent solely upon whether the circumstances of the offense
> exhibit viciousness above the minimum elements required for
> conviction of that offense.  Rather, the relevant inquiry is whether
> the circumstances of the commitment offense, when considered in
> light of other facts in the record, are such that they continue to be
> predictive of current dangerousness many years after commission
> of the offense.  This inquiry is, by necessity and by statutory
> mandate, an individualized one, and cannot be undertaken simply
> by examining the circumstances of the crime in isolation, without
> consideration of the passage of time or the attendant changes in the
> inmate's psychological or mental attitude.  [citations omitted].

In re Lawrence, 44 Cal. 4th at 1221.  See also In re Shaputis, 44 Cal. 4th at 154-55.

> In this federal habeas action challenging the denial of release on parole it is the

court's task to determine "whether the California judicial decision approving the [Board's]

decision rejecting parole was an 'unreasonable application' of the California 'some evidence'

requirement, or was 'based on an unreasonable determination of the facts in light of the

evidence.'"  Hayward, 603 F.3d at 563.  See also Pearson, 606 F.3d at 609 ("Hayward

specifically commands federal courts to examine the reasonableness of the state court's

determination of facts in light of the evidence."); Cooke, 606 F.3d at 1213; McCullough, 2010

WL 5263140, at *4.  Accordingly, below the court considers whether the Board's decision to

1    deny parole in this case constituted an unreasonable application of the "some evidence" rule or

2    was based on an unreasonable determination of the facts in light of the evidence of record.

3            2. <u>State Court Opinion</u>

4            On March 19, 2009, the San Diego County Superior Court rejected petitioner's

5    due process challenge to the Board's 2008 decision in a reasoned decision on the merits.

6    (Answer, Ex. 2 (Doc. No. 10-3.))  The California Court of Appeal and California Supreme Court

7    summarily denied petitioner's habeas petitions challenging the Board's 2008 unfavorable

8    suitability decision, thereby adopting the reasoning of the Superior Court.  See <u>Ylst v.</u>

9    <u>Nunnemaker</u>, 501 U.S. 797, 803-04 (1991).  Therefore, this court will "look through" the

10   decisions of the California Court of Appeal and California Supreme Court to the decision of the

11   San Diego County Superior Court as the basis for the state court's judgment.

12           In denying relief, the Superior Court stated as follows:

13           In the present case, it appears the BPH was concerned with
             Petitioner's mental state in terms of his present attitude, as is
14           detailed below, rather than the precise language of unsuitability
             factor number 5 that discusses "a lengthy history of severe mental
15           problems related to the offense."

16           In the present case, this BPH Panel closely reviewed the
             psychological evaluation done by Dr. Robert Record in October,
17           2007, less than a year before the subject hearing.  Specifically, the
             Panel said: "The Doctor does mention social Phobia, Social
18           Anxiety Disorder in Partial Remission.  *And that's the most
             concerning thing to the Panel today.*"  (Decision Transcript, page
19           7:4-6, emphasis added.)  Commissioner Sandra Bryson then read
             the following into the decision: "The inmate does meet the criteria
20           for Social Phobia, Social Anxiety Disorder, by current mental
             health interdisciplinary progress notes and treatment plan.  A
21           Social Phobia is described as a marked and persistent fear of one or
             more social or performance situations in which the person is
22           exposed to unfamiliar people or the possible scrutiny by others.
             The individual fears that he will act in a way or show anxiety
23           symptoms that would be humiliating and embarrassing."  (Decision
             Transcript, page 7:9-19.)
24
             The quotation set forth above and the one following immediately
25           below is provided in this Order to show why this Court cannot
             overturn the BPH decision, but also to indicate its disagreement
26           with the following quotations from page 11 of the Petition

                                        17

[Petitioner claims the Panel "failed to set forth a scintilla of evidence suggesting an unreasonable *current* parole risk or *any* evidence explaining *how* or *why* the outdated facts recited" render Petitioner an unreasonable risk] and at page 14 as the first paragraph under "relief requested." ["The risk to public safety posed by Mr. Hansen's parole, as assessed in his forensic psychological evaluation is 'low.' The panel failed to set forth any contrary evidence because none exists in the record. The panel failed to suggest any nexus of arguably applicable 17-year-old offense factors it recited to Mr. Hansen's forensically determined low current public safety risk."]

Actually, neither of these statements is exactly true. The "Social Phobia" discussed above certainly was a concern of this Panel that tied in with the commitment offense and how it occurred and what might occur once Petitioner is released outside the strictly regulated society of the prison. The following long quotation from Commissioner Bryson is set forth here to illustrate this further.

"It's important, though, that you get a hold of yourself in this regard. And not that you can never have—display any symptoms, but that you somehow come to terms and maturity with fact that this is something that occurs, that you just present yourself in the best light and there's—it's really out of your control beyond that. Because what it appears that you've done in your past was a lot of medicating to cover up for anxieties that you had about life. And understandably, you were a victim in many ways earlier in your childhood, according to your testimony. But we want to make sure that you don't lash out and victimize somebody else in your anxiety and frustrations and anger in the future. That's all we're concerned about. And, so, it's important for us to see more time for you and in that regard, we're recommending that we understand you said you have a small circle of friends, all trying to basically make progress, which is good. We understand the threats that are posed in here, which I'm sure on a daily basis, by various entities that operate in prison today . . . . But those exposures out in real life make us nervous, but we all have to cope with them, and we can't revert to means of self-medicating or other means of—that will ameliorate that—those phobias that we all have to some degree. So, this Panel would like to see you attempt to do that. To reach out, to go outside your comfort level, because otherwise, you threaten in being here, to become institutionalized and be just doing your thing. And when you get out, people are going to be knocking on your door and you won't be able to just hide in the closet, as it were. And you have obviously much to give, so it's again, we're challenging you to step outside your comfort level a bit. Try to give somebody else some assistance in something and find out how that works for you, because you may find out that the less you think about yourself, the more confident you're going to become." (Decision Transcript, page 8:2–9:22)

1    While that quotation does not come out and specifically say, "This
     is why you are currently dangerous or a risk to society." However,
2    it does strongly indicate that the Panel was very concerned about
     how Petitioner might react to the rigors of open society, especially
3    in light of the circumstances surrounding the commitment offense.
     Returning to a house with a loaded gun shooting a full clip into that
4    residence and killing a 13-year-old girl, simply because Petitioner
     he (sic) was annoyed and thought the drug dealer who apparently
5    took his $40 and fled without producing the drugs may have been
     inside.
6
     The Panel wanted to separate these two events – the commitment
7    offense and the current mental state –to make sure that this
     Petitioner was not the <u>risk</u> the Commissioners were concerned he
8    might still be.  The bottom line is that this Panel provided many
     hints on how to be ready for the next suitability hearing and for
9    Petitioner to make his chances as best as he could to be released on
     parole at that time.
10
     To finally reiterate this concern, it is helpful to set forth here a
11   paragraph from page 9 of the above-referenced psychological
     report from Dr. Record: "As for the 'management of future risk'
12   domain, the inmate would be exposed to a variety of situations in
     the community which may have led to his unstable and socially
13   deviant lifestyle and *may impact his coping strategies in the future.*
     Therefore, it is also important to determine the likelihood of the
14   inmate's exposure to significant stress and/or destabilizers, as well
     as evaluating the nature and extent of outside support and how the
15   inmate will respond to such support.  In this inmate's case, there
     are a variety of possible stabilizing factors which *increase his risk*
16   *of violence.*  First, he has a history of polysubstance abuse and
     should he return to alcohol and drugs it would increase his violence
17   risk.  On the other hand, Mr. Hansen indicates that he has letters of
     support from his family and friends and most impressive, the judge
18   who sentenced him to his life term [FN omitted].  He has a place to
     live in Chula Vista, California where he will be with his family
19   including his mother and sister.  He has jobs lined up and appears
     to have a good parole plan."  (Emphasis added.)
20
     Based upon all of these articulated concerns expressed in the
21   quoted material above and a review of the psychological
     evaluation, this Court shares the BPH's concerns.  Therefore, it
22   cannot overturn the decision to decline to set a parole date.

23   The BPH believed that this Petitioner still needed more time in
     custody to resolve these issues.  This Court has not found any
24   reason to disagree and will not upset the BPH decision.  Thus, for
     the reasons states above, this Petition is DENIED.
25

26   (Answer, Ex. 2 (Doc. No. 10-3.)) at 4-7.)

3. <u>Analysis</u>

In addressing the factors it considered in reaching its 2008 decision that petitioner

was then unsuitable for release on parole, the Board in this case stated as follows:

PRESIDING COMMISSIONER BRYSON: Sir, the Panel
reviewed all information received from the public and relied on the
following circumstances in concluding that you are not suitable yet
for parole and would pose an unreasonable risk of danger to society
or a threat to public safety if released from prison.  Sir, this will be
a one-year denial.  This offense was especially callous and cruel in
that on the afternoon of September 19th, 1991, you and others
wished to purchase 40 dollars worth of methamphetamine, driving
to an apartment on Abermal in the city of San Diego.  You tried to
contact Christina Almanar (sp), with no results.  Michael
Eschevez, who lived in the apartment below Christina's with the
victims, and they were Diane Rosales, a 13-year old female and her
five-year old brother, Louie.  Told the - - Told you that - -
Eschevez had told you that he could get drugs.  And later, you gave
Eschevez money, but Eschevez did not return with the dope.
Multiple victims were attacked or killed in this same incident.
After waiting for a time, you and your co-participants got a
handgun and planned to return to find Eschevez and either get your
money back or beat him up.  And at approximately 1930 hours, you
drove the car down Abermal with the lights out and maneuvered
near the house, fired the gun repeatedly at the dwelling.  This
offense was carried out in a dispassionate and a calculated manner.
Inside, Diane was struck in the head by one of the shots, later dying
from her wound.  Her brother, Louie, witnessed her getting shot
and tried to crawl away, out of the range of the bullets.  Tracing the
vehicle to you, based on witness information, at approximately
0300 hours on September 20th, 1991, law enforcement officers
located you at a motel in San Ysidro.  A vehicle search revealed
the 9-millimeter semi-automatic pistol and an empty ammunition
clip for the weapon.  You did admit firing the gun at the apartment
and your blood alcohol in the vicinity of the time of the
commitment offense was .17 percent.  It was estimated by others
that, in fact, with the time elapsed, your blood alcohol at the time
was probably between .20 and .30 percent.  This offense was
carried out in a manner demonstrating exceptionally callous
disregard for human suffering, because indeed, you were only
interested in yourself after and during the crime.  Public safety was
indeed at risk - - witnessed the crime, by the gunfire.  And you had
clear opportunity to cease at many points in this terrible pursuit for
what was a very trivial matter.  And that was a drug deal gone bad.
It was a drug rip-off for the measly sum of 40 dollars.  Sir, this
Panel finds that you're making a journey to understand the nature
and magnitude of this commitment offense.  You have made
progress since this - - I was the same member on the former Panel
in 2006, and you appear to have made progress.  But you're on a

20

journey, and it's a significant crime and you need to continue that journey. We understand that it's a lot different from our putting a checkmark in a box and you having to serve that time. But this time is very important in this case, and in your particular case, because you do have a history of some sociological - - You had a terrible childhood that you've represented having been molested by your uncle, sexual abuse by your stepfather and you started very early into alcohol and drugs and got very deep into them. But you've made the journey of understanding that there was - - there were reasons behind those choices; negative though they were. And you've reached out and plumbed that, and we think that's very important. It's curious that you didn't mention and I didn't prompt you to mention anything about the brother whenever we went through the crime. I frankly wasn't going to say anything. The District Attorney brought that out, and interestingly enough, even in your closing, you didn't mention him. And in a way, he's one of the worst, sorriest victims here, because he can't escape that. He's got to live with that for his entire life, everyday he gets up. I'm sure there's a picture in his head. So that's interesting, and it's something it would be important for you to think about. Your institutional behavior has been very good. Your - - You've been working consistently. You have always worked as far as I know since you've been in here. You're now working as a Cook in the Dinning Room. You also worked in Landscaping prior. You have two vocations; one you achieved in 1997, Vocational Auto Upholstery after achieving your GED in 1993. And in 2004, Air Conditioning and Refrigeration, and you're certified; EPA certified as an HVAC Technician. You've also take computer courses. So you've worked obviously very hard. I know there was discussion also about restitution at the last hearing, and in fact, I believe you've paid some restitution already.

INMATE HANSEN: Correct.

PRESIDING COMMISSIONER BRYSON: And your parole plans reflect that you're thinking on top of it to set up regular payments once you do get out into a restitution fund, so that's very good. Also mentioned in the - - in the hearing today were the laudatory chronos you've received. You received at least one laudatory chrono in 2008. You also have been participating in self-help and therapy regularly. In the past, you've taken Goal Setting groups, Substance Abuse, Lifer Psychotherapy. In the past, you've had Parenting Skills and you've taken AA since 1997. We have chronos that were read into the file from 2006 - - or record, 2006, 2007 and 2008, and you - - when questioned about them today, you've also progressed in that area. It appears that you've really internalized those tools. At the former hearing in 2006, when questioned about the tools, it was difficult for you to respond. But today, you responded, and of course, the whole point is to have those ready and available to you if you need them on the outside; not to say oh, well, you know, I forgot number 12 or whatever.

21

1   Clearly, you're working those tools - - those Steps to make them
available to you as tools, which is very good.  As to the
2   psychological - - First, let me cover.  You do have one 115 for
mutual combat, which is a serious 115.  You've explained it.
3   There's nothing to contradict - - contraindicate your explanation in
the record of that mutual combat.  So, it is, as they say, what it is
4   and you have been forthright and honest, we believe about that.
You don't have a pattern of 128(a)s that are significant in your file.
5   So you have a good record of misconduct and the last and only 115
in 2002, was now six years ago.  So, you've put distance between
6   yourself and that, and hopefully, will not get anymore 115s at all.
As to the psychological report dated September 22nd, 2007, by Dr.
7   Robert E. Record, Dr. Record in total does support your parole,
and it is a departure from the other - - from the previous clinician's
8   report.  The Panel finds that the most important thing now is for
you to show positive behavior and continuing improvement and
9   work on the route to parole.  The psychological assessment
division, which is the Forensic Assessment Division or FAD
10   Division, does - - is not normally doing psychological evaluations
every year.  So we're not asking for a new report.  But we are
11   making this part of the record to say that there - - it's important that
the diagnostic impressions included Poly Substance Dependence in
12   Institutional Remission.  That's clear.  The Doctor does mention
Social Phobia, Social Anxiety Disorder in Partial Remission.  And
13   that's the most concerning thing to the Panel today.  On Axis II, No
Diagnosis.  And as to your Global Assessment of Functioning, it's
14   very good, 85.  The clinician says:

15   "The inmate does meet the criteria for Social
Phobia, Social Anxiety Disorder by current mental
16   health interdisciplinary progress notes and treatment
plan.  A Social Phobia is described as a marked and
17   persistent fear of one or more social or performance
situations in which the person is exposed to
18   unfamiliar people or the possible scrutiny by others.
The individual fears that he will act in a way or
19   show anxiety symptoms that would be humiliating
or embarrassing."
20
And, of course, as we all know, it's like thinking about a white
21   elephant.  If you try not to think about a white elephant, that's the
more you think about him.  And, so, when you get nervous about
22   coming into parole suitability hearings, it's understandable that the
harder you try, the more nervous you're going to make yourself.
23   It's important, though, that you get a hold of yourself in this regard.
And not that you can never have - - display any symptoms, but that
24   you somehow come to terms and maturity with the facts that this is
something that occurs, that you just present yourself in the best
25   light and there's - - it's really out of your control beyond that.
Because what it appears that what you've done in your past was a
26   lot of medicating to cover up for anxieties that you had about life.

22

And understandably, you were a victim in many ways earlier in
your childhood, according to your testimony.  But we want to make
sure that you don't lash out and victimize somebody else in your
anxiety and frustrations and anger in the future.  That's all we're
concerned about.  And, so, it's important for us to see more time
for you and in that regard, we're recommending that we understand
you said you have a small circle of friends, all trying to basically
make progress, which is good.  We understand the threats that are
posed in here, which I'm sure on a daily basis, by various entities
that operate in prison today.  But it's important for you to finds
ways to reach out and perhaps look to help other inmates, perhaps
with some tutoring, which you're clearly intelligent enough to do
or some other programs that would actually move out into a little
more exposed position in the sense that when you got out into the
real world, you're going to be very exposed; job interviews, a guy
that gets angry at you on the corner.  Who knows?  But those
exposures out in real life make us all nervous, but we all have to
cope with them, and we can't revert to means of self-medicating or
other means of - - that will ameliorate that - - those phobias that we
all have to some degree.  So, this Panel would like to see you
attempt to do that.  To reach out, to go outside your comfort level,
because otherwise, you threaten in being in here, to become
institutionalized and be just doing your thing.  And when you get
out, people are going to be knocking on your door and you won't
be able to just hide in the closet, as it were.  And you have
obviously much to give, so it's, again, we're challenging you to
step outside your comfort level a bit.  Try to give somebody else
some assistance in something and find out how that works for you,
because you may find out that the less you think about yourself, the
more confident you're going to become.  The Doctor continues to
give you a very low, indeed, risk assessment on the basis of either
risk for violence and risk for recidivating.  And those are per the
Psychopathy Checklist, in which he rates you as very low, the
Level of Service Case Management Inventory and the History
Clinical Risk Management-20.  On all of these measures, you rated
very low.  But he does indicate in the body of his report, that:

> "He does demonstrate psychological stability and of
> particular interest, in his ability to ask for help for
> his social phobia.  His social phobia has nothing to
> do with any crime scenario."

That may or may not be true.  I don't know.  He makes that
statement.  I don't know.  He indicates also, the mental health
progress, notes clearly indicate he's tried to work on the role that
alcohol and drugs have played in his crime, and to make sure that
he's never in the same predicament again.  And he feels that
you've made a good attempt at dealing with the underlying causes
of your crime.  He also indicates that you do have a support system
that you have, and it's true.  You have a good support system.
You're very fortunate.  In fact, not only with your sister in Chula

1   Vista who has offered you assistance finding a job and money and
    a vehicle, but a place to reside in a - - in a home, basically of your
2   own.  But you have both immediate and extended family support.
    You did present two documented job offers that appear within your
3   marketable skills and you also have thought ahead about a relapse
    prevention plan for the outside, going to the unusual step of having
4   a sponsor out there as well as a way of providing for another
    sponsor if you should need it.  You also have thought about
5   updating your skills outside, and you presented schedules, AA
    meeting schedules so that you can continue with AA.  As to Penal
6   Code 3042 responses, we do have a - - we did have a response
    letter, which was referenced in the body of the hearing from Judge
7   Bernard E. Revak, R-E-V-A-K, a - - the Superior Court Judge,
    Retired.  We did review that e-mail, and basically, it - - Judge
8   Revak did leave that to the Board's decision.  He did not make a
    recommendation one way or another.  We do have opposition from
9   the District Attorney of San Diego County as well as the San Diego
    Police Department.  And I should note also, your parole plans
10  included continued payment, again, into the restitution fund.  And
    that you also received a support letter from your ex-wife, which
11  was impressive to the Panel.  So, sir, it appears that you have only
    positive things ahead of you, and now you need to just continue
12  that journey.  And we hope to see you in, again, in a year and see
    the progress you've made.  And think about the statements you've
13  made here today and review, if you will, the transcript when it is
    available to you.  Commissioner Mahoney, do you have anything
14  to add?

15  DEPUTY COMMISSIONER MAHONEY: Just you've been doing
    a good job in here and keep up the good work.
16
    PRESIDING COMMISSIONER BRYSON: And, Commissioner
17  Gillingham?

18  COMMISSIONER GILLINGHAM: I echo Deputy Commissioner
    Mahoney's statement.
19

20  (Pet. (Doc. No. 1) at 101-12.)

21          As discussed above, the last reasoned decision rejecting petitioner's due process

22  claim is that of the San Diego County Superior Court denying habeas relief with respect to the

23  Board's 2008 decision finding petitioner unsuitable for parole.  The Superior Court found that

24  the Board was "concern[ed]" about petitioner's "mental state in terms of his present attitude,"

25  and believed that he "still needed more time in custody to resolve these issues."  (Answer, Ex. 2

26  at 4, 7.)  The Superior Court did not find "any reason to disagree" or "upset the [Board's]

24

1   decision." (Id. at 7.)  For the reasons set forth below, this court concludes that the Superior

2   Court's decision in this regard was an unreasonable application of the "some evidence" rule and

3   was based on an unreasonable determination of the facts in light of the evidence of record.

4          In reaching this conclusion this court notes that the only factor indicative of

5   unsuitability for parole explicitly relied on by the Board was the unchanging circumstances of

6   petitioner's commitment offense.  In this regard, the Board found that the commitment offense

7   was carried out in a dispassionate and calculated manner, was especially callous and cruel,

8   demonstrated an exceptionally callous disregard for human suffering, that multiple victims were

9   attacked, and was committed for a very trivial reason.  (Pet. (Doc. No. 1) at 101-03.)  As noted

10  above, the factors to consider in deciding whether the prisoner's offense was committed in an

11  especially heinous, atrocious, or cruel manner include:  multiple victims were attacked, injured,

12  or killed in the same or separate incidents; the offense was carried out in a dispassionate and

13  calculated manner, such as an execution-style murder; the victim was abused, defiled or

14  mutilated during or after the offense; the offense was carried out in a manner that demonstrated

15  an exceptionally callous disregard for human suffering; the motive for the crime is inexplicable

16  or very trivial in relation to the offense.  Cal. Code Regs., tit. 15, § 2281(c)(1)(A) - (E).  Certainly

17  the record before this court establishes that petitioner was callous in indiscriminately shooting

18  into the apartment, thereby causing the death of a young girl, and that his motive was trivial in

19  relation to the seriousness of the offense.  In this regard, petitioner fired multiple shots into an

20  inhabited dwelling, resulting in the death of a young girl, in response to being robbed of a mere

21  $40 while trying to purchase drugs.  Indeed, it is only by chance that petitioner did not kill or

22  injure the other child in the home at the time of the shooting.[4]  Id.

23  /////

24  

25       [4]  It is not clear from the record, however, that petitioner's offense conduct also satisfied
    other factors set forth in Cal. Code Regs., tit. 15, § 2281(c)(1)(A) - (E) that would support a
26  finding that the commitment offense was carried out in an "especially heinous, atrocious, or cruel
    manner."

1    As noted in the discussion above, a California prisoner's commitment offense can

2    constitute "some evidence" to support the Board's unsuitability decision as long as it is still

3    relevant to a determination of the inmate's current dangerousness.  In re Lawrence, 44 Cal. 4th at

4    1221; In re Shaputis, 44 Cal. 4th at 154-55.  Specifically, "the circumstances of a commitment

5    offense cannot constitute evidentiary support for the denial of parole 'unless the record also

6    establishes that something in the prisoner's pre-or post-incarceration history, or his or her current

7    demeanor and mental state, indicates that the implications regarding the prisoner's dangerousness

8    that derive from his or her commission of the commitment offense remain probative to the

9    statutory determination of a continuing threat to public safety.'"  Cooke, 606 F.3d at 1216 (citing

10   Lawrence, 44 Cal.4th at 1214).  See also McCullough, 2010 WL 5263140, at *6  (Ninth Circuit

11   affirming the grant of habeas relief where due process was violated by "reliance upon the

12   immutable and unchanging circumstances of [the] commitment offense" in the parole denial).

13   Here, the record reflects that there was no evidence before the Board with respect to petitioner's

14   pre-or post-incarceration history, or his demeanor or mental state, that indicated that the

15   implications of dangerousness derived from the commission of the commitment offense

16   remained probative to a determination of petitioner's current dangerousness.

17   In this regard, while the circumstances of the commitment offense were the only

18   explicitly cited unsuitability factor relied upon in denying parole, the Board did also discuss

19   petitioner's psychological evaluation at great length.  Specifically, the Board stated that "the most

20   concerning thing to the Panel" was petitioner's Social Phobia, Social Anxiety Disorder in Partial

21   Remission diagnosis.  (Pet. (Doc. No. 1) at 107.)  The Board went on to state:

> But we want to make sure that you don't lash out and victimize
> somebody else in your anxiety and frustrations and anger in the
> future.  That's all we're concerned about.  And, so, it's important
> for us to see more time for you ...

25   (Id. at 108.)

26   /////

26

The psychological evaluation in question, however, concluded that petitioner's social phobia was not implicated in his commitment offense and did not indicate any risk for future violence, with the psychologist concluding:

> [Petitioner] does demonstrate psychological stability and of particular interest is he has the ability to ask for help for his social phobia.  His social phobia has nothing to do with any crime scenario.
>
> * * *
>
> Based on findings via risk assessment tools, file review, and a forensic clinical interview of the inmate, it is the undersigned's opinion that this inmate is a **"very low"** risk for future violence. The following factors decrease his level of violence in the community.  First of all, he does not have a major Axis I mental illness.  He does have an Axis I social phobia but it is not of a psychotic nature and he has worked hard and it is a life-long phobia that he has controlled since childhood and is not a cause of any criminal type of behavior.

(Id. at 123-24.) (emphasis in original.)  The Forensic Contract Psychologist, Dr. Record, went on to conclude that:

> Taken together, the weight of the evidence indicates that the inmate poses a **"very low risk"** of violence in the community.  At this time there is significant evidence that the inmate has developed the skills and insight necessary for decreasing his risk of violence.

(Id. at 124.) (emphasis in original.)

Aside from the circumstances of the commitment offense and the Board's expressed concern regarding petitioner's social phobia diagnosis, the Board in 2008 did not cite any other factor which would support a finding that petitioner posed a current danger to society if released on parole supervision.  During the hearing, however, petitioner and the Board panel did discuss numerous factors indicative of his suitability for release on parole at that time, several of which were cited by the Board in its decision.

/////

/////

1         In this regard, prior to the commitment offense petitioner had no history of

2    criminal activity.  (Id. at 54.)  His Current Custody Level in 2008 was Medium A and he had a

3    Classification Score of 19.[5]  (Id. at 62.)  Since his incarceration petitioner earned his GED,

4    completed courses in life skills and computers, and had been continually involved in Alcoholics

5    Anonymous.  (Id. at 66-67.)  Petitioner had received laudatory chronos from Correctional Officer

6    Fowler for his dedication to his work and from Staff Psychologist Bauerman for his participation

7    in the Lifer Group.  (Id. at 67-68.)  Psychologist Bauerman had also opined that petitioner was "a

8    very low risk for recidivism."  (Id. at 68.)

9         Petitioner completed vocational training in Automotive Upholstery and Air

10   Conditioning and Refrigeration, even obtaining EPA certification.  (Id. at 69.)  Petitioner's parole

11   plans included living at a residence provided by his sister, an officer with the San Diego Police

12   Department.  (Id. at 78, 80.)  Petitioner's sister indicated she would provide him his own vehicle,

13   would pay for the car insurance and would assist him in obtaining his drivers license.  (Id. at 78.)

14        Petitioner's sister submitted information requested by petitioner from the San

15   Diego City College regarding courses available to petitioner to update and continue his heating,

16   ventilating and air conditioning certificates, as well as schedules for nearby AA meetings.  (Id. at

17   79, 86.)  She indicated that petitioner had an AA sponsor already identified in the event of his

18   release.  (Id. at 80.)  Moreover, she and petitioner "set up a program" and "made up a contract"

19   guaranteeing that ten percent of petitioner's pay will "automatically be garnished" and go

20   towards the restitution he owes to the State of California Victim Witness Fund.  (Id. at 81.)

21   Petitioner submitted numerous letters of support from his family and friends, including a letter

22

23       [5] A classification score reflects the security control needs on an inmate, where higher
24   scores correspond to greater needs.  Cal. Code Regs., tit. 15, § 3375(d).  An inmate with a
     classification score of 19 through 27 shall be placed in a Level II facility.  Cal. Code Regs., tit.
25   15, §3375.1.  An inmate serving a life term without an established parole date of three years or
     less, cannot be housed in a Level I facility, regardless of his classification score.  See Cal. Code
26   Regs., tit. 15, § 3375.2.  In this regard, it appears that petitioner's classification score and custody
     level are the lowest available for a life-term inmate convicted of a violent offense.

1  from his ex-wife, along with two offers of employment upon his release.  (Id. at 78, 81-82.)

2         Additionally, during his entire period of incarceration petitioner had received only

3  one 115, which stemmed from a mutual combat incident in 2002.  (Id. at 63.)  Petitioner

4  explained that the incident arose out of a dispute with his cellmate regarding moving.  (Id.)

5  During an argument petitioner's cellmate "swung on" petitioner, petitioner then "grabbed a hold

6  of him to keep him from swinging . . . anymore" and once his cellmate "calmed down" petitioner

7  reported the incident to an officer.  (Id.)  The Board recounted that "according to the report"

8  petitioner "went up to the C.O., said you're going to have to separate us" and stated that his

9  cellmate "swung at" him.  (Id. at 64.)  According to the report petitioner had superficial scratches

10  to his upper head.  (Id.)  There was no mention of any injury to petitioner's cellmate.  (Id.)

11         Despite these numerous positive factors noted by the Board, petitioner was

12  nonetheless found unsuitable for release on parole based solely on the circumstances of his

13  commitment offense and the social phobia diagnosis noted in petitioner's most recent

14  psychological evaluation.  However, there is no dispute that the psychological evaluation in its

15  entirety was favorable to petitioner, as evidenced by the fact that even the Board panel

16  acknowledged to petitioner that it "in total does support your parole . . ."  (Id. at 106.)  Indeed,

17  the psychological evaluation emphatically concluded that petitioner posed a very low risk for

18  future violence, despite his social phobia.  Most importantly, the evaluating psychologist

19  concluded that petitioner's social phobia "had nothing to do with any crime scenario," that

20  petitioner had controlled his life-long phobia since childhood and that the condition was "not a

21  cause of any criminal type of behavior" whatsoever.  (Id. at 123.)  Given this record, it cannot be

22  said that there is evidence that petitioner had a lengthy history of severe mental problems related

23  to the offense, which could serve as a proper factor for an unsuitability finding.  See  Cal. Code

24  Regs., tit. 15, § 2281(c).  Rather, in this case petitioner's social phobia diagnosis has no

25  relevance to the current dangerousness determination and could not have been properly relied

26  upon by the Board to support it's denial of parole.  See In re Lawrence, 44 Cal. 4th at 1212

29

1    ("[T]he relevant inquiry is whether some evidence supports the decision of the Board or the

2    Governor that the inmate constitutes a current threat to public safety, and not merely whether

3    some evidence confirms the existence of certain factual findings."); Cooke, 606 F.3d at 1213-14

4    (The court must ensure that the decision to deny parole is "supported by some evidence, not

5    merely by a hunch or intuition.")

6           All that is left then is petitioner's now over nineteen-year-old commitment

7    offense, the circumstances of which are immutable and unchanging and can no longer serve, in

8    keeping with due process, as the sole basis for finding petitioner currently dangerous and

9    unsuitable for release on parole.  See McCullough, 2010 WL 5263140, at *6; Cooke, 606 F.3d at

10   1214; Lawrence, 44 Cal. 4th at 1211; see also Rosenkrantz v. Marshall, 444 F. Supp.2d 1063,

11   1084 (C.D. Cal. 2006) ("After nearly twenty years of rehabilitation, the ability to predict a

12   prisoner's future dangerousness based simply on the circumstances of his or her crime is nil").

13          Because there was no evidence supporting the Board's determination that

14   petitioner was unsuitable for parole in 2008 the decision of the state courts rejecting petitioner's

15   due process claim was an unreasonable application of California's "some evidence" requirement.

16   Petitioner is therefore entitled to federal habeas relief.

17   III.  Proper Remedy

18          Having determined that the state court's decision approving the Board's denial of

19   parole in this case was an unreasonable application of the California "some evidence"

20   requirement, this court turns to consider the appropriate remedy.  The California Supreme Court

21   has held that under the California Constitution, only the executive branch has the authority to

22   make parole-suitability determinations.  In re Prather, 50 Cal. 4th 238, 253 (2010).  The court

23   concluded that to avoid infringing on executive branch authority, a proper order granting habeas

24   relief where the "some evidence" requirement was not properly applied should require the Board

25   to "proceed in accordance with due process of law" and not "direct the Board to reach a

26   particular result or consider only a limited category of evidence in making the parole suitability

determination."  Id.  In turn, the Ninth Circuit Court of Appeals has concluded that in light of the

duty of the federal courts to enforce liberty interests as they are defined by state law, a federal

habeas court may not grant a remedy in excess of that determined to be adequate to address a due

process violation under California law by the high court of that state.  Haggard v. Curry, 623 F.3d

1035, 1041-43 (9th Cir. 2010).

Nonetheless, the Board's discretion on remand is, as a matter of law, limited by

this court's order.  As the California Supreme Court has explained:

> [T]he Board is required to adhere to the decision of the Court of
> Appeal irrespective of any specific limiting directions in the court's
> order.  In conducting a suitability hearing after a court's grant of
> habeas corpus relief, the Board is bound by the court's findings and
> conclusions regarding the evidence in the record and, in particular,
> by the court's conclusion that no evidence in the record before the
> court supports the Board's determination that the prisoner is
> unsuitable for parole.  Thus, an order generally directing the Board
> to proceed in accordance with due process of law does not entitle
> the Board to "disregard a judicial determination regarding the
> sufficiency of the evidence [of current dangerousness] and to
> simply repeat the same decision on the same record."  ([In re]
> Masoner [2009] 172 Cal. App.4th [1098,] 1110, 91 Cal. Rptr.3d
> 689.)  Rather, a judicial order granting habeas corpus relief
> implicitly precludes the Board from again denying parole - unless
> some additional evidence (considered alone or in conjunction with
> other evidence in the record, and not already considered and
> rejected by the reviewing court) supports a determination that the
> prisoner remains currently dangerous. [¶]  In the majority of cases,
> such additional evidence will be new - that is, changes will have
> occurred in the prisoner's mental state, disciplinary record, or
> parole plans subsequent to the last parole hearing.

In re Prather, 50 Cal. 4th at 258.  See also Hardwick v. Clarke, No. Civ. S-06-672 LKK DAD P,

2010 WL 3825678, at *3 (E.D. Cal. Sept. 28, 2010) ("[T]he Board, in reviewing the August 3,

2010 hearing, would be bound by this court's conclusion that there was no evidence of

petitioner's current dangerousness.")[6]

---

[6]  The decision in Prather leaves undisturbed the requirement under California law,

> that the Board has a duty to provide the prospective parolee, as
> well as the court, with a definitive statement of reasons for denying

In light of the conclusion reached above regarding the denial of parole based upon this record, any further proceedings should be undertaken in an expedited fashion with petitioner being granted release on parole unless it can be demonstrated that subsequent developments require the denial of parole. In re Prather, 50 Cal. 4th at 262 (Moreno, J., concurring); see also In re Twinn, 190 Cal. App.4th 447,___, 2010 WL 4723782, at *18 (Cal. App. 2 Dist. Nov. 23, 2010) ("[W]e direct the Board to proceed in accordance with its usual procedures for release of an inmate on parole unless within 30 days of the finality of this decision the Board determines in good faith that cause for the rescission of parole may exist and initiates appropriate proceedings to determine that question."); London v. Subia, No. CIV S-07-1489-LKK-CMK-P, 2010 WL 4483473, at *5 (E.D. Cal. Nov. 1, 2010) (noting that the Board is not a party in a federal habeas action and ordering the warden to release petitioner within forty-five days of the order granting habeas relief if a new parole suitability hearing is not held).[7]

---

> parole, nor to contravene the corollary principle that [ ] the Board may not deny parole solely based on evidence that it reasonably could have produced at the previous parole hearing.

In re Prather, 50 Cal. 4th 238, 261 (2010) (Moreno, J., concurring). See also In re McDonald, 189 Cal. App. 4th 1008, ___, 2010 WL 4296703, at *10 (Cal. App. 2 Dist. Nov. 2, 2010) ("The Board cannot, after having its parole denial decision reversed, continue to deny parole based on matters that could have been but were not raised in the original hearing.")

[7] On October 20, 2010, petitioner filed a request for judicial notice, advising this court that on August 27, 2010, in an unpublished decision, the California Court of Appeal for the Fourth Appellate District granted him habeas relief, finding that the Board's subsequent 2009 decision denying him parole for three years was unsupported by the evidence and in violation of the holding of the California Supreme Court in Shaputis. (Doc. No. 12.) However, petitioner also reported that following the granting of habeas relief by the state court, the Board held another suitability hearing and again denied him parole for three years. This court has reviewed the unpublished decision of the state appellate court and confirmed that petitioner remains incarcerated in state prison at this time. Therefore, mootness is not at issue. However, the undersigned would note that should these findings and recommendations be adopted, the Board could not rely on a subsequent parole hearing at which the phobia diagnosis was considered in denying petitioner. These findings and recommendations have concluded that in 2008 the phobia diagnosis had no relevance to the current dangerousness inquiry and could not play a role in meeting the some evidence standard. See In re Prather, 50 Cal. 4th at 258, 262; In re Twinn, 190 Cal. App.4th 447,___, 2010 WL 4723782, at *18; In re McDonald, 189 Cal. App. 4th 1008, ___, 2010 WL 4296703, at *10; see also Hardwick, 2010 WL 3825678, at *3.

CONCLUSION

Accordingly, IT IS HEREBY RECOMMENDED that:

1. Petitioner's application for a writ of habeas corpus be granted;

2. Respondent be directed to release petitioner within thirty days unless a new parole suitability hearing is held in accordance with due process of law and in a manner consistent with this order and the decisions of the California Supreme Court and Ninth Circuit Court of Appeals addressed herein; and

3. Respondent be directed to file a status report with this court within thirty days of any order adopting these findings and recommendations advising the court of petitioner's release or, if a new suitability hearing is held within the time provided, reporting the outcome of that hearing.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within seven days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: December 30, 2010.

_____
DALE A. DROZD
UNITED STATES MAGISTRATE JUDGE

DAD:6
hansen2646.hc

33